SEATTLE OPERA, Petitioner/Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.

American Guild of Musical Artists, AFL–CIO, Intervenor.

No. 01–1127.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 21, 2002.

Decided June 11, 2002.

Richard L. Cys argued the cause for the petitioner. Thomas A. Lemly was on brief.

Usha Dheenan, Attorney, National Labor Relations Board, argued the cause for the respondent. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Attorney, National Labor Relations Board, were on brief.

Melissa J. Auerbach argued the cause for the intervenor. Michael Hill Holland entered an appearance.

Before: HENDERSON, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Dissenting opinion filed by Circuit Judge RANDOLPH.

KAREN LeCRAFT HENDERSON, Circuit Judge:

The Seattle Opera (Opera) petitions for review of a February 8, 2001 decision and order of the National Labor Relations Board (Board or NLRB). *See Seattle Opera Ass'n & Am. Guild of Musical Artists,* Case 19–CA–27288 (Feb. 8, 2001). In the order, the Board held that the Opera's refusal to bargain with the American Guild of Musical Artists (Union)—after the Union was certified as the collective bargaining representative of an allegedly appropriate unit of the Opera's employees—constituted an unfair labor practice (ULP) under section 8(a)(5) and (1) of the National Labor Relations Act (Act), 29 U.S.C. § 158(a)(5), (1). On review, the Opera does not dispute that it refused to bargain with the Union. Instead, it contests the Board's conclusion that the Opera's auxiliary choristers are "employees" under the Act and that, as employees, they were properly included in the bargaining unit. In the alternative, the Opera argues that, even if the auxiliaries *are* employees, they are casual employees lacking a sufficient community of interest with other Opera employees to be included in the bargaining unit. The Opera's contentions are without merit; we therefore deny its petition for review and grant the NLRB's cross-application for enforcement of its order.

## I.

The Union represents a bargaining unit of choristers, dancers, stage managers, assistant stage managers and assistant stage directors of the Opera. The collective bargaining agreement between the Opera and the Union sets forth several categories of choristers—regular choristers, temporary regular choristers, alternate choristers and auxiliary choristers. The Opera produces approximately five operas per season and employs 36 regular choristers to fill its basic seasonal chorus requirement. Regular choristers are required to perform in at least half of the operas offered per season and, in order to maintain their regular-chorister status, must undergo periodic auditions and evaluations. Under the agreement, each regular chorister is paid at least $160 "for any single performance" and $16 per hour "for each hour of rehearsal or fraction thereof." Joint Appendix (JA) 83. They are eligible to receive a parking reimbursement of $5 per performance or rehearsal if they submit an expense reimbursement form with "available receipts." JA 90.

The Opera has a pool of 100 to 200 auxiliary choristers who audition before a musical committee. From the pool of auxiliaries, the Opera selects up to 16 "alternate choristers" to fill additional openings in the chorus when a production requires more than 36 regulars or when regulars are unavailable. If a regular takes a leave of absence, his replacement is designated a "temporary regular chorister." Alternate choristers are given a right of first refusal to perform as temporary regulars. When alternates perform as "alternate choristers," they receive $20 for each rehearsal and performance; when they perform as "temporary regular choristers," they are paid at the higher regular-chorister rate described above and, like regulars, are eligible to receive a parking reimbursement of $5 per rehearsal or performance if they

submit an expense reimbursement form with "available receipts." JA 90.

Like alternates, those auxiliaries who have not been selected as alternates may yet be called upon to perform when a production requires more than 36 choristers.[1] Moreover, if the Opera cannot fill the temporary regular chorister positions with alternates, it often relies on auxiliaries to fill the empty slots. Once selected for a given production, an auxiliary signs a letter of intent agreeing to be available for all rehearsals and performances; he also signs a letter of understanding by which he agrees to adhere to the attendance and decorum requirements spelled out in a handbook provided by the Opera. The auxiliary receives a flat fee of $214 for the production, whether he incurs expenses or not; he is not required to submit any receipts or forms to receive the full fee. The Opera originally considered the $214 fee an "honorarium" but now calls it a "transportation expense" reimbursement.

All choristers performing in a given production—be they regulars, temporary regulars, alternates or auxiliaries—are listed together in the program under the heading of "Chorus." Auxiliaries share dressing facilities and receive makeup instructions and costume fittings with the other choristers. Also, during the production, auxiliaries often perform with regular choristers in "small group" performances. At least half of the current regular choristers began with the Opera as auxiliaries.[2]

On March 30, 2000 the Union petitioned for a self-determination election among the Opera's alternate and auxiliary choristers,[3] in an effort to add the alternates and auxiliaries to the bargaining unit. The Opera agreed that the alternates could be included in the unit but objected to the inclusion of the auxiliaries, protesting that they are not employees under the Act.

On May 3, 2000 the Board's Regional Director for Region 19 agreed that the auxiliaries are not employees under the Act and therefore could not be included in the bargaining unit. *See Seattle Opera Ass'n & Am. Guild of Musical Artists*, Case 19–RC–13939 (May 3, 2000). On August 24, 2000 the Board reversed the Regional Director, holding that the auxiliaries *are* employees under the Act. *See Seattle Opera Ass'n & Am. Guild of Musical Artists*, Case 19–RC–13939 (Aug. 24, 2000). The Board remanded to the Regional Director the unresolved question whether the auxiliaries are casual employees. On September 20, 2000 the Regional Director issued a supplemental decision holding that the auxiliaries are not merely casual employees and that adding them to the bargaining unit would be appropriate. *See Seattle Opera Ass'n & Am. Guild of Musical Artists*, Case 19–RC–13939 (Sept. 20, 2000). He directed an election in which the auxiliaries were to decide "whether or not they desire to be represented for collective bargaining purposes by [the Union]." JA 15. The Board then conducted an election by secret mail ballot. The Union won the election and the Board certified it on November 14, 2000 as "the exclusive collective-bargaining representa-

---

1. For example, if 53 choristers are needed for a given production, the pool of 16 alternates will not suffice to round out the chorus, even assuming all 36 regulars and all 16 alternates are available for the production.

2. The Board found the fact that "performing as an auxiliary chorister counts toward satisfying the prerequisite for employment as a general chorister, i.e., that the applicant has

sung in two previous productions," JA 10, further supported its conclusion that auxiliaries are employees.

3. A self-determination election allows unrepresented employees to decide whether or not they want to be added to an existing bargaining unit. *See generally St. Mary's Duluth Clinic Health Sys.*, 2000 WL 1920362 (N.L.R.B. Dec.15, 2000).

tive of the employees in the following appropriate unit: All alternate and auxiliary choristers employed by [the Opera]." JA 25.

After its certification, the Union requested that the Opera bargain with it over the auxiliaries' terms of employment. The Opera refused and the Union filed a ULP charge. On December 13, 2000 the Regional Director issued a complaint alleging that the Opera's refusal to bargain violated the Act. The Opera filed an answer admitting its refusal to bargain but also challenging the validity of the Union's certification. The Regional Director moved for summary judgment and the Opera responded to the motion by claiming that the auxiliaries are not employees under the Act. On February 8, 2001 the Board issued the order under review. The Board found that "[a]ll representation issues raised by the [Opera] were or could have been litigated in the prior representation proceeding," JA 25; accordingly, it affirmed its August 24, 2000 holding that the auxiliaries are employees under the Act. Thus, because the auxiliaries were properly included in the bargaining unit, the Board concluded that the Opera had violated section 8(a)(5) and (1) of the Act by refusing to bargain with the Union. It ordered the Opera to cease and desist from engaging in similar ULPs; to recognize and bargain with the Union upon request; to embody in a signed agreement any understanding reached; and to post copies of a remedial notice.

## II.

■ The Opera asks us to grant its petition and reinstate the Regional Director's initial decision because, it claims, the auxiliaries are not employees within the Act's coverage. In the alternative, the Opera argues that the auxiliaries are merely casual employees lacking a sufficient community of interest with other Opera employees to be included in a bargaining unit. In addressing the Opera's contentions, we do not undertake a *de novo* inquiry. *See Physicians Nat'l House Staff Ass'n v. Fanning*, 642 F.2d 492, 496–97 (D.C.Cir.1980) (en banc) ("Whether a particular individual is an employee depends upon the facts. The task of decision on the facts of each case ... has been assigned primarily to [the Board,] the agency created by Congress to administer the Act." (quotations omitted)); *see also* 29 U.S.C. § 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). Rather, we must ask whether the "Board's determination that [the auxiliaries] are 'employees' under [the] Act ... has warrant in the record and a reasonable basis in law." *Allied Chem. & Alkali Workers of Am. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 166, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (quotations omitted). We conclude that it does.

### A.

■ With respect to the Opera's first claim—that the auxiliaries are not employees within the Act's purview—"our inquiry starts from the fundamental canon that statutory interpretation begins with the language of the statute itself." *Butler v. West*, 164 F.3d 634, 639 (D.C.Cir.1999) (quotation omitted). The relevant statutory text states:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an ag-

ricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined.

29 U.S.C. § 152(3) (emphasis added).

■ While the statutory definition is somewhat unhelpful, we are not without guidance; in *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), the United States Supreme Court made clear that

[t]he breadth of § 2(3)'s definition is striking: the Act squarely applies to "any employee." The *only limitations* are specific exemptions for agricultural laborers, domestic workers, individuals employed by their spouses or parents, individuals employed as independent contractors or supervisors, and individuals employed by a person who is not an employer under the [Act].

*Id.* at 891, 104 S.Ct. 2803 (emphasis added). Because the Opera does not claim that the auxiliaries fall within any of section 152(3)'s specific exemptions, resolution of the Opera's petition turns on the provision's opening words: "The term 'employee' shall include any employee...." *See id.*; *see also Sunland Constr. Co.,* 309 N.L.R.B. 1224, 1226 (1992) ("Under the well settled principle of statutory construction—*expressio unius est exclusio alterius*—only these enumerated classifications are excluded from the definition of 'employee.'" (footnote omitted)). Although the words might appear hopelessly circular, the Court's decision in *NLRB v. Town & Country Electric, Inc.,* 516 U.S. 85, 116

S.Ct. 450, 133 L.Ed.2d 371 (1995), provides the necessary interpretive assistance:

The ordinary dictionary definition of "employee" includes any "person who works for another in return for financial or other compensation." American Heritage Dictionary 604 (3d ed.1992). See also Black's Law Dictionary 525 (6th ed.1990) (an employee is a "person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed"). The phrasing of the Act ... reiterate[s] the breadth of the ordinary dictionary definition [when] it says "[t]he term 'employee' shall include *any* employee."

*Id.* at 90, 116 S.Ct. 450 (emphasis in original). Given that the Court has assigned such weight to the plain meaning of the term "employee," it is clear that—where he is not specifically excluded from coverage by one of section 152(3)'s enumerated exemptions—the person asserting statutory employee status *does* have such status if (1) he works for a statutory employer in return for financial or other compensation, *see id.*; *see also WBAI Pacifica Found.,* 1999 WL 676522, at *3 (N.L.R.B. Aug.26, 1999) (requiring "presence of some form of economic relationship between the employer and the individual held to have statutory employee status"); and (2) the statutory employer has the power or right to control and direct the person in the material details of how such work is to be performed, *see Town & Country Elec.,* 516 U.S. at 90, 116 S.Ct. 450.

■ The Opera concedes that auxiliary choristers receive a flat sum of $214 for their work in a particular production.[4] It argues, however, that the fee "is not intended to be 'compensation' in return for

---

4. This single fact distinguishes the auxiliaries from the nonemployee individuals in *WBAI,* a

labor or services performed ... but rather a reimbursement for out of pocket costs an [auxiliary] is likely to incur" in connection with attending rehearsals and performances. Br. of Pet'r at 17. Several facts in the record suggest otherwise. First, the auxiliaries receive $214, no more and no less, regardless of the amount of any transportation, parking and other miscellaneous expenses they incur. We note the contrast in this regard between the auxiliaries on the one hand and the Opera's non-employee "supernumeraries"[5] and youth choristers on the other; the latter are true volunteers in that they receive no fee at all (regardless of the amount of expenses *they*

incur). Second, the auxiliaries are entitled to the fee even if they incur *no expenses at all* (e.g., if they walk to the opera house or if a friend drops them off). Third, while the Opera labels the fee a "transportation expense" reimbursement,[6] the auxiliaries are not required to submit expense reimbursement forms or receipts to receive the full sum.[7] Indeed, that the Opera did not explain to the Board how it arrived at the $214 "transportation expense" set-off—much less present evidence of parking costs or distances traveled—bolsters the Board's conclusion that the remuneration qualifies as compensation for the auxiliaries' work.[8]  *See*  JA 10.  Nothing

decision which the dissent claims the Board has erroneously neglected, *see* dissenting op. at 2; the "unpaid staff" in *WBAI* were just that—unpaid. *See WBAI,* 1999 WL 676522, at *4–5 ("Unpaid staff do not receive compensation for their work at the station.... Although there is evidence that at least one unpaid staff member received travel reimbursement, it does not appear to be a widespread practice."). Thus, the purported employer-employee relationship in *WBAI* lacked the requisite economic element that exists, and is widespread, here. That the fee, in the dissent's estimation, amounts to "the grand sum of $2.78 per hour" and is below minimum wage, dissenting op. at 773, has no bearing on the section 152(3) analysis. The only support the dissent can marshal for a contrary proposition, *Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), is no support at all; *Walling* involves interpretation of the Fair Labor Standards Act. Under the *National Labor Relations Act,* the amount of (as opposed to the mere fact of) compensation is irrelevant.

**5.** Supernumeraries are analogous to "extras" in a film—they are simply performers with nonspeaking parts.

**6.** We decline to lend evidentiary credence to this label, especially given the fact that, until recently, the Opera referred to the flat fee as an "honorarium."

**7.** The Opera argues that "[w]hether an [a]uxiliary must request the reimbursement, or provide proof of expenditures for travel and

parking, is inconsequential [because] the travel reimbursement is merely intended to be an approximation of travel and parking costs for the typical [a]uxiliary, and Seattle Opera has decided it is not worth the administrative time, effort and cost to collect and process receipts and reimbursement forms." Br. of Pet'r at 18. It contends that the Board neglected its "cost-efficiency reasoning" in handling the payment to auxiliaries as it did. *Id.* at 13; *see also id.* at 17–18. Even if the Opera's cost-efficiency reasons were relevant to the section 152(3) inquiry, however, nothing in the record suggests that it presented those reasons to the Board or that "extraordinary circumstances" prevented it from doing so. *Hyatt Mgmt. Corp. of New York, Inc. v. NLRB,* 817 F.2d 140, 143 n. 2 (D.C.Cir.1987) (where petitioner failed to raise issue before Board, it was "barred from raising it in a petition for review, absent 'extraordinary circumstances' which [were] clearly not present" (quoting 29 U.S.C. § 160(e))).

**8.** The dissent seeks to fill the mathematical gap left by the Opera and offers numerous suppositions about how much a given auxiliary might make per hour or per trip. *See* dissenting op. at 773–74. For instance, the dissent calculates that—far from being compensated for their work performance—auxiliary choristers will not even receive full reimbursement for their travel expenses unless "they live or have a day job within 9.2 miles of the Opera House." *Id.* at 774. For all the Board knew, however—given that the Opera proffered neither the calculations the

in the record justifies our disturbing that conclusion.[9]

dissent offers nor any evidence about distances traveled—*all* of the auxiliaries lived within 9.2 miles of the opera house. Whether the dissent's calculations are accurate or not, the Board has no obligation to weigh evidence not presented to it. *See Allied Chem. & Alkali Workers*, 404 U.S. at 166, 92 S.Ct. 383 (court will uphold Board's "employee" determination if it "has warrant *in the record* and a reasonable basis in law" (emphasis added)).

The dissent also supposes that if the auxiliaries are in fact employees under the Act, they and the Opera are in violation of the federal tax laws because they "are not on the payroll" and "no taxes of any sort are withheld from their $214." Dissenting op. at 776. However, the Opera does not take issue with the Board's omitting to consider the tax treatment of the $214 payments. While the Opera states in its brief that no taxes are withheld from the payments, it never explains the *legal* significance of the fact. *See* Br. of Pet'r at 17, 22, 27. Accordingly, by failing to raise the tax argument adequately on appeal, the Opera has waived it. *See Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C.Cir. 1997) (litigant does not argue issue by addressing it in "cursory fashion"); *Ry. Labor Executives' Ass'n v. United States R.R. Ret. Bd.*, 749 F.2d 856, 859 n. 6 (D.C.Cir.1984) (declining to decide issue "on the basis of briefing which consisted of only three sentences...and no discussion of the...relevant case law"). The dissent's assertion that we have "unfair[ly]" declined to consider the tax issue, dissenting op. at 776 n.5, is surprising to say the least; for a party that had purportedly "made the tax argument in its brief not once but three times" (by merely stating the fact that "no taxes are withheld"), *id.*, the Opera at oral argument was caught decidedly off-guard by our dissenting colleague's inquiries:

Q: [D]id they give [the auxiliaries] W–2 forms?
A: I don't believe they did, but I can't tell you for sure that that is in the record.
Q: That's not in the record. Okay.
A: I'm not sure that question was asked [before the Board]....
Q: [I]f "employee" means the same under the Internal Revenue Code that it does under the NLRB, then every one of these 150 [auxiliaries] has violated the federal tax laws.
A: I'm not sure I follow that, Your Honor....
Q: They didn't report—

A: I don't know why they should, if it's reimbursement for expenses.
Q: No. If the NLRB is right ... and "employee" means the same in the Tax Code as it does in the National Labor Relations Act, then they have put 150 people in violation of the federal income tax and they owe back taxes, with penalties.
A: I mean, I would have to go back if—in court—if this Court does not accept our position, we'd have to go back and look at that. But it certainly is a de minimis amount of money.

*Infra* at 767–69 (Oral Arg. Tr. at 13–15); *see also infra* at 770–72 (Oral Arg. Tr. at 24–25, 36). The conclusion that our dissenting colleague raised the tax issue *sua sponte* at oral argument—surprising the Board and thereby precluding it from "suggest[ing] 'waiver,' " dissenting op. at. 776 n.5—seems inevitable, especially given that the record contains no evidence whatsoever regarding (1) the Opera's tax reporting treatment of the $214 payments; or (2) the auxiliaries' reporting or failing to report properly any payments to federal and state taxing authorities.

The Opera's decision not to argue the tax issue is unsurprising in any event. As counsel for the Board correctly stated at oral argument, the fact that the auxiliaries were not given W–2 forms "doesn't mean that the[y] aren't employees under the Act," *infra* at 771 (Oral Arg. Tr. at 25); the tax treatment of the payments is of little analytical significance where "the Board [can] reasonably conclude that ... various indicia of employee status," like compensation and a right of control, "outweigh those factors suggesting otherwise," including tax treatment. *NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d 57, 61–62 (1st Cir.1981) (Breyer, J.) (package delivery drivers found to be employees under section 152(3) even though company made no deductions for unemployment, workmen's compensation, social security insurance or income taxes); *see J. Huizinga Cartage Co. v. NLRB*, 941 F.2d 616, 620 (7th Cir.1991) (same, observing that "if an employer could confer independent contractor [i.e., non-employee] status through the absence of payroll deductions there would be few employees falling under the protection of the Act"); *NLRB v. Keystone Floors, Inc.*, 306 F.2d 560, 561, 563 (3d Cir.1962) (salesmen found to be employees under section 152(3) even though company made no deductions for social security or income tax).

**9.** While the dissent makes much of the Regional Director's calculations, *see* dissenting

■ Moreover, the record shows that the Opera possesses the right to control the auxiliary choristers in the material details of their performance. Auxiliaries are required to sign letters of understanding and intent agreeing to adhere to the attendance and decorum requirements spelled out in a handbook provided by the Opera.[10] The Opera requires the auxiliaries to sign in when they arrive, on time, at each and every rehearsal and performance. Pursuant to the handbook, the auxiliaries receive artistic feedback and are expected to follow musical and dramatic direction while on stage. The auxiliaries undergo the same costume fittings and make-up instruction as regular and alternate choristers. In short, like all choristers, auxiliaries must sing their part lest the whole production suffer.[11]

In light of the foregoing facts, as well as the "degree of legal leeway" the Board possesses "when it interprets its governing statute, particularly where Congress likely intended an understanding of labor relations to guide the Act's application," *Town & Country Elec.*, 516 U.S. at 90, 116 S.Ct. 450, we cannot say the Board exceeded its authority in concluding that the auxiliary choristers are employees within the meaning and reach of 29 U.S.C. § 152(3).

## B.

■ We reject as well the Opera's alternative claim—that the auxiliary choristers are casual employees lacking a sufficient community of interest with other

op. at 773–75 & n.3, the Director's conclusion that the $214 amount is only "sufficient to let an individual roughly break even with out-of-pocket expenses," JA 5, was based on mere speculation about the travel, parking and meal expenses that the "average" auxiliary chorister might incur and in fact ignored testimony that some auxiliaries incurred no expenses at all.

**10.** The letter of understanding requires an auxiliary to affirm the following by signature:

> I have read the Seattle Opera "Auxiliary Handbook" provided for my benefit. I understand these requirements, including those addressing attendance and decorum, and *agree to comply* as a condition of being considered as an Auxiliary Chorister. If I have any questions, I understand that I can contact the Chorus Personnel Coordinator or the Music Coordinator for clarification. I understand that *failure to comply with these guidelines may lead to my dismissal* as an Auxiliary Chorister from this production, and my removal from consideration as an Auxiliary Chorister from any future opera. JA 13 (emphasis added).

**11.** The dissent—delivered *molto agitato*—believes it "outright silly" for the Board or for us to consider that the Opera has the power to control the auxiliary choristers in the material details of their performance. Dissenting op. at 776. The dissent itself acknowledges, however, that the Board can and should consider the common law definition of "employee" when performing a section 152(3) analysis. *See id.* at 775–76; *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) ("[W]hen Congress has used the term 'employee' without [clearly] defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine."). The Board did not act arbitrarily in finding that there was a master-servant relationship here; the dissent's observation that an opera is an especially "collective enterprise" in which "[e]veryone has to sing at the same time," dissenting op. at 776, only bolsters the Board's conclusion. Indeed, had the Board *ignored* the Opera's amount of control over the auxiliaries, its neglect of the common law definition could have rendered its decision arbitrary and capricious. *See Town & Country Elec.*, 516 U.S. at 94, 116 S.Ct. 450 ("In some cases, there may be a question about whether the Board's departure from the common law of agency ... renders its interpretation unreasonable.").

Opera employees to be included in the bargaining unit—because it is not properly before us.

Its assertions to the contrary notwithstanding, *see* Reply Br. of Pet'r at 15–17, the Opera failed to preserve for review its casual employee argument. Upon concluding in his supplemental decision that auxiliaries are not casual employees, the Regional Director explicitly advised the Opera of its right, pursuant to 29 C.F.R. § 102.67, to file a request for review of his findings. The Opera never filed such a request. Section 102.67(f), therefore, would have precluded the Board from considering the Opera's casual employee claim in the ULP proceeding even if the Opera had attempted to raise the claim, which it did not. 29 C.F.R. § 102.67(f); *see Alois Box Co. v. NLRB*, 216 F.3d 69, 77 (D.C.Cir.2000) ("Because the company did not raise [its argument] in the unfair labor practice proceeding, the Board was entitled to treat [it] as abandoned."). The Act provides that "[n]o objection that has not been urged before the Board … shall be considered by the [reviewing] court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The Opera does not allege that extraordinary circumstances exist here. Accordingly, we do not consider its casual employee argument.

### III.

For the foregoing reasons, the Opera's petition for review is denied and the NLRB's cross-application for enforcement of its February 8, 2001 order is granted.

*So ordered.*

THE COURT: I don't want to monopolize all of your time, but I have a couple other questions. Is there any evidence that the Opera gave W-2 forms to these people?

MR. CYS: There is evidence that they did not. I think the record reflects that they didn't. I know that it says there were no deductions.

THE COURT: Right. But did they give them W-2 forms?

MR. CYS: I don't believe they did, but I can't tell you for sure that that is in the record.

THE COURT: That's not in the record. Okay.

MR. CYS: I'm not sure that question was asked.

THE COURT: They get workman's comp, right? They're covered by workman's comp?

MR. CYS: Yes, under Washington State law. I see that my time --

THE COURT: There were no deductions for state taxes.

MR. CYS: No.

THE COURT: There were no deductions for federal income taxes. There was no --

MR. CYS: That's correct.

768

THE COURT: -- deduction for Social Security.

MR. CYS: That's correct.

THE COURT: There was no deduction for Medicare or Medicaid.

MR. CYS: Correct. And there were no benefits.

THE COURT: So if "employee" means the same under the Internal Revenue Code that it does under the NLRB, then every one of these 150 people has violated the federal tax laws.

MR. CYS: I'm not sure I follow that, Your Honor.

THE COURT: Let me ask --

THE COURT: They didn't report --

MR. CYS: I don't know why they should, if it's reimbursement for expenses.

THE COURT: No. If the NLRB is right --

MR. CYS: Oh, I'm sorry.

THE COURT: -- and "employee" means the same in the Tax Code as it does in the National Labor Relations Act, then they have put 150 people in violation of the federal income tax and they owe back taxes, with penalties.

MR. CYS: I mean, I would have to go back

if -- in court -- if this Court does not accept our position, we'd have to go back and look at that. But it certainly is a de minimis amount of money. Even if they were in all five productions, it's a little over $1,000. So I --

THE COURT: Let me ask you, in terms of what is in the record, the $214 was originally or earlier called an honorarium.

MR. CYS: Correct, Your Honor. I think in 1994 in was changed.

THE COURT: Does the record indicate: a) why it was changed, and b) how the $214 was calculated as an honorarium?

MR. CYS: The answer to both questions is no. One of the witnesses testified that she believed the term was changed in '94 or '95, and the amount also changed, as I recall, from $150 in the early '90s to this amount. But I don't believe there's any showing as to what the methodology was for it.

THE COURT: Is there anything in the record that would show that we could figure out this amount based on what the -- these auxiliaries get, the ones who actually receive benefits and everything?

MR. CYS: Do you mean the alternates, Your Honor?

a) that if somebody gets expenses that they are, therefore, an employee?

MS. DHEENAN: The Board hasn't reached that issue, because in this case the Board found that it wasn't expenses; it was compensation. So I don't know what the Board would say about that case.

THE COURT: We're kind of going around in circles because I'm not sure how the Board comes to the conclusion it's compensation. If you -- by "compensation," you mean wages, right?

MS. DHEENAN: Well, yes. I mean, if you want to call it wages.

THE COURT: There certainly is --

MS. DHEENAN: I mean, payment for services rendered, I guess.

THE COURT: Right. There certainly is fairly overwhelming evidence that it's not, that this is not compensation for services. If it were compensation for services, the employer would be required to withhold, would they not?

MS. DHEENAN: Right. But, I mean, the fact that they're not withholding doesn't mean that it's not compensation.

THE COURT: Right. And it's --

MS. DHEENAN: I mean, you can't --

THE COURT: Bear with me. And if it's compensation for services, each of the employees was required to pay -- or each of the singers was required to pay taxes on it, right?

MS. DHEENAN: Well, presumably. I don't know what the Tax Code says about de minimis amounts and what not, but --

THE COURT: There's not a de minimis, and there's no indication these employees even got W-2 forms.

MS. DHEENAN: Right. But I don't know the fact that -- I don't know that you can rely on the fact that the -- the Opera, as the person -- as the entity that would be responsible for that, you know, the fact that they didn't do it doesn't mean that these aren't employees under the Act.

THE COURT: I'm not saying it's conclusive. It's evidence. It tends to make it more likely than not that they did not consider this compensation for wages.

MS. DHEENAN: Well, that's true. But the Opera's intent is not a dispositive factor. I mean, it's really not a factor at all.

THE COURT: No, it's not.

MS. DHEENAN: I mean, what they intended

It seems to thwart the intent of the National Labor Relations Act to let people who are working as employees have the right to bargain.

THE COURT: Do you know of any cases where someone is held to be an employee under the National Labor Relations Act but not an employee under the Fair Labor Standards Act?

MS. AUERBACH: The purposes of the acts are different. I don't think -- where somebody is an employee under the National Labor Relations Act, I'm not aware of cases that discuss the parallels between the two. I think there is no reason why someone has to be an employee under Fair Labor Standards to be under the National Labor Relations.

THE COURT: How about under the Tax Code, do you know of any cases where you're an employee for the National Labor Relations Act but not an employee under the Tax Code?

MS. AUERBACH: I'm not aware of cases that, you know, were comparing the two. I mean, it may be somebody is in violation of other fair labor standards laws here or tax laws or something else. That wasn't the focus of the record -- the Board's decision.

THE COURT: Okay.

RANDOLPH, Circuit Judge, dissenting:

This is an important case to volunteers throughout the country and to the organizations they assist. By one estimate, more than 109 million Americans in 1998 freely gave their time and energy to help in the arts and humanities, in education, health, youth development, environment, and so forth. *See* INDEPENDENT SECTOR, THE NEW NONPROFIT ALMANAC IN BRIEF 16 (2001). Some volunteers receive nominal payments to defray their expenses. Now the National Labor Relations Board, at the instigation of a union representing regular employees, has decided that volunteers are also "employees" and are entitled to bargain collectively over wages, hours and working conditions. The rule of "law" embedded in the Board's decision is this: if volunteers are paid a flat amount to reimburse them for expenses, the payment is "wages" and the volunteers become "employees." In my view, the Board's decision is arbitrary and ridiculous. The majority opinion only compounds the Board's errors. I therefore dissent.

The Seattle Opera is a non-profit organization, nearly forty years old, specializing in the operas of Richard Wagner. On infrequent occasions the Opera needs more choristers for a production than its 36 regular choristers and their alternates. To fill the gap, the Opera draws on a contingent of volunteers—the "auxiliary chorister volunteers," as they are known. These are individuals, trained in voice, who volunteer their services to the Opera. If they pass the audition, they are added to the list of some 200 auxiliary choristers. When and if the Opera calls upon them, they are free to decline without consequence. If they agree to volunteer for a production, they of course must show up for evening rehearsals and for the performances, and sing in tune and in unison. For their efforts, each volunteer chorister is invited to the Opera's end-of-the-season

"volunteers party"; they receive a "Volunteer Dress Rehearsal Pass"; and—critical to the Board's thinking—they are paid a flat amount of $214 after the last performance as reimbursement for travel and parking expenses.

A rose is a rose and under the definition in the National Labor Relations Act, an "employee" is an "employee." 29 U.S.C. § 152(3). To break the circle, the Board holds that volunteers are not "employees." *See WBAI Pacifica Found.*, 328 N.L.R.B. No. 179, 1999 WL 676522 (Aug. 26, 1999). The *WBAI* decision should have led the Board to declare that the auxiliary choristers were not employees. To "work for hire," the Board ruled in *WBAI*, "is to receive compensation for labor or services." *Id.* at *4. The Supreme Court, quoting with approval a House Committee report, said much the same: "An 'employee,' according to all standard dictionaries, according to the law as the courts have stated it, and according to the universal understanding of almost everyone ... means someone who works for another for hire." *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 167, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). By no stretch are the auxiliary choristers being paid for their services, or are they working "*in return for* financial or other compensation." Maj. op. at 762 (emphasis added). The most telling fact is the amount they receive.

On average, an auxiliary chorister is expected to attend 7 music rehearsals (each lasting for 3 hours), 7 stage rehearsals (each lasting for 4 hours), and 8 performances (about 3 1/2 hours in length). In other words, if the $214 were wages rather than reimbursement for expenses the auxiliary choristers were making the grand sum of $2.78 per hour. The Regional Director, after making the same calculations, had it right—"the amount received is trivi-

al"; it represents "only an amount sufficient to let an individual roughly break even with out-of-pocket expenses" and is probably not enough to accomplish even that; "the 'economic reality' is that nobody can be functioning as an auxiliary primarily for immediate financial gain."

The Board rejected the Regional Director's analysis for this reason: "to find individuals not to be employees because they are compensated at less than the minimum wage, or because their compensation is less than a living wage, contravenes the stated principles of the Act." *Seattle Opera Ass'n*, 331 N.L.R.B. No. 148, 2000 WL 1224905, at *3 (Aug. 24, 2000). Of course this assumes the very issue—that the $214 represents compensation rather than a reimbursement for expenses. And exactly what "principles of the Act" does the Board have in mind? There is of course no principle that volunteers have a right to bargain collectively over wages. Volunteers are not paid wages. But to take the Board's logic, one might as well say that because volunteers receive no compensation for their labor, that is all the more reason "the principles of the Act" give them a right to bargain collectively for some compensation. At any rate, the Board's "reasoning"—I hesitate to call it that—flatly contradicts the leading case of *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), on which the Regional Director relied. In *Walling*, a railroad gave training to prospective brakemen and paid successful trainees retroactively at the rate of $4 per day for their training period (this translates into roughly $32 per day in current dollars). The Court held that despite the payment, the trainees were not "employees" subject to the minimum wage law because they were not being compensated for work performed. In language that applies equally to the auxiliary choristers and other volunteers throughout the country, the Court refused to sweep within the law "each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure worked in activities carried on by other persons either for pleasure or profit." 330 U.S. at 152, 67 S.Ct. 639.[1]

Rather than simply assuming that the $214 represented wages, the Board should have tested its thesis through elementary mathematics. The parking lots near the Opera House are coin operated (so no receipts are given). For a rehearsal or performance, parking would cost about $4. Given the average number of rehearsals and performances (22), this amounts to $88 in parking fees. Under the collective bargaining agreement the Opera reimburses some union members for transportation expenses at the rate of 31 cents per mile. For auxiliary choristers driving from their home to the Opera House and back for all 22 rehearsals and performances, this comes to the handsome total of $2.86 per trip ($214 less $88 divided by 44). At 31 cents per mile, these volunteers will receive full reimbursement for their travel expenses only if they live or have a day job within 9.2 miles of the Opera House.[2]

---

1. The majority dismisses the Supreme Court's decision in *Portland Terminal* on the ground that it arose under the Fair Labor Standards Act. Maj. op. at 763 n.4. But the Board's *WBAI* opinion relied on the treatment of volunteers under the Fair Labor Standards Act and found no evidence that the individuals there would be considered "employees." *WBAI*, 328 N.L.R.B. No. 179, 1999 WL 676522, at *5 n. 3. Yet in this case, the Board disregarded the Regional Director's de-

cision that the auxiliary choristers were not employees, in part on the basis that it relied on the Fair Labor Standards Act. *See Seattle Opera Ass'n*, 331 N.L.R.B. No. 148, 2000 WL 1224905, at *3 n. 4.

2. The majority states that for "all the Board knew ... *all* of the auxiliaries"—that is, all 200 of them—"lived within 9.2 miles of the opera house." Maj. op. at 763 n.8. The absurdity of this supposition is probably why

Maybe the phantom of the opera did not have commuting expenses but in modern society most everyone else does.[3]

Not content with the Board's own irrationalities, the majority makes up one of its own. It supposes that an auxiliary chorister might walk to all rehearsals and performances, and thus incur no travel expenses. Maj. op. at 763. What is the point? That because someone walks to the Opera Hall, every auxiliary chorister does? Or is it that because a chorister or two might get to the Opera Hall without driving, all auxiliary choristers must be singing for wages? The majority also is impressed with the fact that none of the auxiliary choristers are required to submit expense reports or receipts. Maj. op. at 763–64. The Board was too. It propounded the following non sequitur: "auxiliaries ... are not required to submit receipts or expense reports, and they receive remuneration in the amount of $214 at the end of a production whether or not they incur costs. Therefore we find the auxiliaries' remuneration to be compensation for their work." *Seattle Opera Ass'n*, 331 N.L.R.B. No. 148, 2000 WL 1224905, at *3. Where does the "Therefore" come from? There is no rule of labor law, at least none the Board or anyone else has identified, holding that unless payments to defray expenses are preceded by an expense report and receipts, the payments must be wages. The Opera's witnesses testified that the $214 represented an approximation of expenses. Flat reimbursement payments are fairly common. (Consider the per diem payment many employees receive when they are on official travel, a payment not considered wages even if the employee did not incur equivalent expenses. *See, e.g., Berry v. Excel Group, Inc.,* 288 F.3d 252 (5th Cir.2002).) Flat payments save on the bookkeeping and are fair to those who are freely giving up their time. Congress recognized as much when it amended the Fair Labor Standards Act.[4] As the Senate report stated, "a volunteer crossing guard does not become an 'employee' because he or she receives a uniform allowance and/or travel expenses." S.REP. No. 99–159, at 14 (1985), U.S.Code Cong. & Admin.News 1985, 651 at 662. The short of the matter is that the $214 paid to the auxiliary choristers is consistent with reimbursement of expenses; it is entirely inconsistent with wages.

The Board's analysis is flawed in many other respects. I will mention just a few. In applying the common law definition of employee, as the Board does in these

the Board did not indulge in it. The majority seems to forget that the Opera was charged with committing unfair labor practices. The burden was on the Board's general counsel to prove those charges, *see* 29 U.S.C. § 160(c), a burden which could not be carried without proving that the auxiliary choristers were "employees" under the Act. Any evidentiary gap therefore militated in favor of the Opera.

3. The majority says that the Board did not have to consider the computations I have set forth in the text because "the Board has no obligation to weigh evidence not presented to it." Maj. op. at 762 n.8. But the computations represent reasoning from evidence already in the record, and it is reasoning that is missing from the Board's decision.

4. Under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.,* which defines "employee" in much the same manner as the National Labor Relations Act, a volunteer at a public agency does not become an employee merely because the person is paid "expenses, reasonable benefits, or a nominal fee." 29 U.S.C. § 203(e)(4). This is true whether the volunteer submits receipts for expenses or receives instead the "approximate" amount of those costs. 29 C.F.R. § 553.106(b). One can distinguish between volunteers and employees under the Fair Labor Standards Act only "by examining the total amount of payments made (expenses, benefits, fees) in the context of the economic realities of the particular situation." 29 C.F.R. § 553.106(f). This is precisely what the Board refused to do.

cases, see *NLRB v. Town & Country Elec., Inc.,* 516 U.S. 85, 94, 116 S.Ct. 450, 133 L.Ed.2d 371 (1995), it should have taken into account the tax treatment of the auxiliary choristers' $214. *See Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 324, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). The Opera's officials testified without contradiction that the auxiliary choristers are not on the payroll and that no taxes of any sort are withheld from their $214. If these payments were in fact wages, as the Board supposed, the Opera—and the auxiliary choristers—were violating the federal tax laws and probably state laws as well. I am not willing to assume any such thing and I do not think the Board had any business doing so either.[5]

The Board and the majority find it significant in determining whether the auxiliary choristers are employees rather than volunteers that the Opera "has the power or right to control and direct the person in the material details of how such work is to be performed." Maj. op. at 762. This is outright silly. Are we to suppose that volunteer firefighters or volunteer rescue workers become "employees" because the fire chief or the head of the rescue squad directs them? As to this case, the Board seems to have forgotten that we are dealing with a choir. Auxiliary choristers join other singers to perform musical works. I can imagine no more collective enterprise. Everyone has to sing at the same time. Unlike a supernumerary (a non-singing extra)—who could miss a performance without much effect—missing singers affect the balance of the choir between the various voice parts. Rehearsal cannot be done

---

**5.** The majority thinks "the tax treatment of the payments is of little analytical significance," citing some court of appeals opinions. Maj. op. at 765 n.8. But the Supreme Court in *Nationwide,* 503 U.S. at 324–25, 112 S.Ct. 1344, decided after the court of appeals decisions the majority mentions, held that in "determining whether a hired party is an employee under the general common law of agency, *we consider ... the tax treatment of the hired party.*" (Italics added.) *See also Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 753, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (relying on the purported employer's failure to deduct taxes as a factor indicating that the individual was not an employee). The Court in *Nationwide* also pointed out that in the past, when the NLRB twice deviated from the common law definition of employee, "Congress amended the statute so construed to demonstrate that the usual common-law principles were the keys to meaning." *Id.* at 324–25, 112 S.Ct. 1344. *See also Willmar Elec. Serv., Inc. v. NLRB,* 968 F.2d 1327, 1329 (D.C.Cir.1992).

In response to this dissent, the majority claims the Opera "waived" any argument about tax withholding. Maj. op. at 763 n.8. This is unfair to the Opera, and to its counsel,

and it is quite wrong. The Opera made the tax argument in its brief not once but three times. The Board never even suggested "waiver" because it knew, better than the majority, that the argument had indeed been preserved and presented. On the basis of ample testimony about the subject in the agency proceedings, the Opera argued to us: "The Seattle Opera does not consider the travel reimbursement to be wages and no taxes are withheld." Brief for Petitioner at 17. It emphasized the point again, arguing that "such reimbursement is not considered wages" because "no taxes are withheld," *id.* at 22; *see also id.* at 27. It was in light of these arguments that the subject naturally came up in oral argument.

Furthermore, the Board could hardly have been surprised that the matter of tax withholding would be discussed. Not only did the Opera argue the point, but also the Regional Director, in determining that the Opera treated the "auxiliaries as volunteers," relied on the fact that "[n]o withholding is taken" out of the $214. While the majority believes the record contains "no evidence" on the subject of tax withholding, maj. op. at 765 n.8, the evidence is there for all to see, as is the Regional Director's factual finding directly on point, a finding the Board never upset.

independently. Choir members need to know not only the notes and the words, but they must also blend their voices together into a single sound. We all pronounce a's and e's a little differently from one another. In this context it is therefore nothing but irrational to treat control and direction as a feature distinguishing a volunteer from an "employee."

The Opera has never treated its auxiliary choristers as anything but volunteers, and they have never viewed themselves otherwise. Their very title is revealing. Most are familiar with the ladies auxiliary, as one type of volunteer group used to be called. The Opera gives each such chorister an "Auxiliary Chorister Volunteer Handbook." At the end of the season, in addition to an invitation to the volunteers party, each auxiliary chorister receives a letter from the Opera's director thanking them for their "contributions" and stating that none of the Opera's achievements would have been possible "without the undying support of Seattle Opera Volunteers."

According to the Board this was all a charade. The Opera paid its auxiliary choristers at less than the minimum wage, in violation of the Fair Labor Standards Act. It did not withhold taxes from their "paychecks," in violation of the federal tax laws. It engaged in phony transactions, pretending to reimburse the auxiliary choristers for expenses, while actually compensating them for their work. It called the auxiliaries volunteers when they were really employees. And by not treating them as employees, the Seattle Opera violated the National Labor Relations Act. Everyone was deluded thinks the Board, everyone that is except the Board itself. The plain truth is the opposite. Something has gone terribly wrong in this case. Courts review Board decisions to correct such aberrations. Too bad we did not perform that function today. What fate awaits this precedent must now depend upon the inevitable petition for rehearing *en banc*.