DISSENTING OPINION BY
JUDGE COHN JUBELIRER
Respectfully, I believe that whether the volunteer firefighters of the “Emmaus Fire Department”[1] (Fire Department), a non-profit corporation, are employees of the Borough of Emmaus must be examined within the extensive statutory framework governing the relationship between *399 municipalities and volunteer firefighters in Pennsylvania.[2] The General Assembly, by adopting the various statutes concerning volunteer firefighters, has intended to allow volunteer firefighters to exist as a distinct class of firefighters. Harmony Volunteer Fire Co. and Relief Ass’n v. Pa. Human Relations Comm’n, 73 Pa.Cmwlth. 596, 459 A.2d 439, 443 (1983). These enactments reflect the General Assembly’s recognition that volunteer fire departments are an integral part of fire protection in Pennsylvania, and that due to the extensive benefits available to them, and the municipalities’ control over their activities, these firefighters occupy a unique area in the context of traditional employment relationships. Accordingly, in order to give effect to the legislature’s intent in matters involving volunteer firefighters, before a determination can be made regarding whether an employment relationship exists by using, for example, the test set forth in Sweet v. Pennsylvania Labor Relations Board, 457 Pa. 456, 322 A.2d 362, 365 (1974), the facts must first be analyzed through the prism of the vast statutory framework underpinning volunteer firefighters to determine whether these facts actually signify a true employment relationship or reflect the distinct and unique statutory arrangement between volunteer firefighters and the municipalities they serve. Unfortunately, in concluding that an employment relationship exists between the Borough and the volunteer firefighters here, such that the Association can be certified as the exclusive representative under Act 111, the Hearing Examiner, the Board, and the Majority did not consider the evidence and facts in the context of this extensive and overarching statutory framework. When this is done, however, it is apparent to me that the Borough’s actions fit within this unique statutory framework and do not create an employment relationship under Act 111. I would, therefore, reverse.
Currently an estimated 94 percent of municipalities in Pennsylvania rely on volunteer firefighters to provide fire protection services.[3] Given the integral role that volunteer firefighters play in providing fire protection services, which are critical to the safety and welfare of the public, it is not surprising that the General Assembly has enacted a myriad of statutes governing volunteer firefighter safety and the relationship between volunteer firefighters and the municipalities they serve. This Court has previously noted that “[n]umerous legislative enactments ... interweave the functioning of the government and the fire company” and that “[ojther statutes also recognize the intimate relationship between a volunteer fire company and governmental entities.” Harmony Volunteer Fire Co. and Relief Ass’n, 459 A.2d at 443. This interweaving is exemplified by numerous statutes which provide for municipal involvement in volunteer firefighter companies through the provision of services, providing financial and administrative assistance, and levying taxes for such appropriations.[4] Several other statutes fur *400 ther the legislative intent to encourage municipalities’ involvement in providing funding for volunteer fee companies.[5] These include authorizing boroughs to secure workers’ compensation insurance,[6] as well as pension contributions from the Commonwealth,[7] for volunteer firefighters. Additional statutes reflect the General Assembly’s intention that municipalities play a significant role in the operation of volunteer fee companies in addition to allowing municipalities to utilize volunteer fire companies for fee protection and encouraging municipalities to provide funding and other benefits for volunteer firefighters. The Emergency Management Services Code (EMS Code) authorizes the Pennsylvania Emergency Management Agency (PEMA) to provide loans to volunteer fire companies for the purpose of, inter alia, purchasing or modernizing facilities and equipment. Section 7364 of the EMS Code, 35 Pa. C.S. § 7364. Section 7364(g) of the *401 EMS Code envisions a role for political subdivisions, like municipalities, in the ownership of volunteer fire companies’ equipment and facilities, stating that volunteer fire companies are eligible for loans “regardless of legal ownership in whole or in part by any political subdivision of any facilities or apparatus equipment used by the volunteer fire company.” 35 Pa. C.S. § 7364(g). In addition, “[a]ny equipment or facilities financed [by PEMA] may be transferred to a political subdivision served by the volunteer fire company.” Id. Prior to obtaining a loan from PEMA, volunteer fire companies are required to demonstrate that they have available 20 percent of the total cost of the facilities or equipment; however,
[i]f a volunteer fire company ... is unable to meet the 20% requirement ... then a political subdivision which is served by the volunteer company may pledge its credit in the amount of funds necessary to satisfy the 20% requirement and, if it does so, shall cosign the application submitted by the volunteer company.
35 Pa. C.S. § 7364(c) (emphasis added). The Borough Code also authorizes borough councils to permit volunteer fire companies “to participate in purchase contracts for petroleum products entered into by the borough.” Section 1404.1 of the Borough Code, 8 Pa. C.S. § 1404.1.
The General Assembly has further indicated that municipalities are to play a role in volunteer firefighter training. The EMS Code provides for the Department of Education to establish the “Pennsylvania State Firemen’s Training School” (Training School) in order to provide “practical training in the control and extinguishment of fires.” Section 7351 of the EMS Code, 35 Pa. C.S. § 7351. Eligibility for admission to the school is available to “[a]ll firefighters who are regularly employed by any local political subdivision ... and all regularly enrolled members of volunteer fire companies ... [who are] chosen by the governing authority of each political subdivision.” Section 7354 of the EMS Code, 35 Pa. C.S. § 7354 (emphasis added). Application for admission to the Training School is made by the political subdivisions themselves. Section 7355 of the EMS Code, 35 Pa. C.S. § 7355.
Realizing that volunteer firefighters are integral to providing fire protection services in our Commonwealth, our General Assembly has also passed several statutes which allow volunteer firefighters to receive some financial benefits in return for their services. Although a volunteer is generally considered someone who does not receive financial compensation for the services provided, our General Assembly has expressed an intention to allow volunteer firefighters to receive some compensation without jeopardizing their volunteer status. As described above, volunteer firefighters receive workers’ compensation benefits under the Workers’ Compensation Act (WC Act) and certain pension and health insurance benefits under the Volunteer Firefighters’ Relief Association Act (VFRAA) and Foreign Fire Insurance Tax Distribution Law (FFITDL), even though they are considered volunteers.
That, pursuant to numerous statutes, volunteer firefighters may receive certain financial benefits and still retain their volunteer status reflects the tension between the traditional definition of employee, as someone who receives compensation for their services, see e.g., Seattle Opera v. National Labor Relations Board (American Guild of Musical Artists, AFL-CIO), 292 F.3d 757, 762 (D.C. Cir. 2002) (holding that an employee is one who receives financial compensation in return for his work), and the unique statutory arrangement created by the legislature to govern volunteer fire *402 fighters. Moreover, these statutes demonstrate the General Assembly’s intent to permit volunteer firefighters to receive some compensation for their services, and be statutorily defined as “employees,” notwithstanding the fact that they retain their status as volunteers. For example, while the definition of “employee” under Section 104 of the WC Act, is a “natural person[ ] who perform[s] services for another for a valuable consideration,” 77 P.S. § 22 (emphasis added), Section 601(a)(1) of the WC Act expands the definition of employee to “include ... members of volunteer fire departments or volunteer fire companies, including any paid fireman who is a member of a volunteer fire company and performs the services of a volunteer fireman during off-duty hours,” 77 P.S. § 1031(a)(1) (emphasis added). See also Borough of Honesdale v. Workmen’s Comp. Appeal Bd. (Martin), 659 A.2d 70, 76 (Pa. Cmwlth. 1995) (stating that, under Section 601(a)(1), volunteer firefighters are deemed employees of the municipality that engages them); Temple v. Milmont Fire Co., 106 Pa.Cmwlth. 120, 525 A.2d 848, 849-50 (1987) (same). Another example is found in Section 7412 of the VFRAA, which indicates that volunteer firefighters may sometimes be paid despite their volunteer status, and defines a volunteer firefighter as:
[a] person who is a member of:
(1) a fire company organized and existing under the laws of this Commonwealth;
(2) a fire police unit, rescue squad, ambulance corps or other like organization affiliated with one or more fire companies; or
(3) a fire company or affiliated organization which participates in the fire service but does not look to that service as his or her primary means of livelihood.
35 Pa. C.S. § 7412 (emphasis added). Likewise, under Section 14339 of The Third Class City Code, a volunteer firefighter is defined as “a driver of firefighting apparatus or ambulances, regularly employed and paid by a volunteer fire company, rendering services recognized and accepted by a city.”[8] 11 Pa. C.S. § 14339 (emphasis added). Furthermore, for purposes of governmental immunity under the Judicial Code, “[vjolunteer firefighters shall be treated as public employees,” and an “[e]mployee” is defined as “[a]ny person who is acting or who has acted on behalf of a government unit whether on a permanent or temporary basis, whether compensated or not and ... including any volunteer fireman and any elected or appointed officer. ...” Sections 8332.3, 8501 of the Judicial Code, 42 Pa. C.S. §§ 8332.3, 8501 (emphasis added).
When considering the evidence and facts in the context of this extensive and overarching statutory framework, it is apparent that the Borough’s actions fit within this unique statutory framework and do not create an employment relationship under Act 111.
For example, the Findings of Fact reflect, inter alia, that the Borough reserved the right to establish rules and regulations for the Fire Department, that the Borough owns the Fire Department building and equipment, that the Borough was responsible for repayment of a loan that the Fire Department obtained from PEMA, that the Borough pays for all of the Fire Department’s expenses directly, that the Fire Department obtains fuel from the Borough garage at no cost, that the Borough’s budget includes 38 line items for the Fire *403 Department, and that the Borough established a fire services tax to raise money for the Fire Department. (FOF ¶¶ 7-12.) The Borough did not file exceptions to these Findings of Fact, instead arguing that the Board misconstrued their importance. I agree with the Borough that these findings are not dispositive because the various transactions described are all expressly allowed under the above-referenced statutes or naturally follow from the Borough’s statutory rights or obligations thereunder. For instance, Section 7364(g) of the EMS Code explicitly allows boroughs to own volunteer fire company equipment and facilities. 85 Pa. C.S. § 7364(g). Section 7364(c) of the EMS Code expressly authorizes boroughs to cosign for loans made to volunteer fire departments and, consequently, become responsible for a volunteer fire company’s loan. 35 Pa. C.S. § 7364(c). Section 1302(6) of the Borough Code permits boroughs to levy taxes in order to make appropriations to volunteer fire companies; thus, it naturally follows that a borough would establish a specific fire services tax to raise money for a fire company. 8 Pa. C.S. § 1302(6). Further, because the Borough is statutorily permitted to own the Fire Department’s equipment and facilities, it is reasonable for it to fund the Fire Department and to exercise significant control over the Fire Department’s budget.
Moreover, the Borough’s obligations and potential liability under the WC Act for the volunteer firefighters, as described above, provide ample explanation for many of the Borough’s actions. These actions include: establishing rules and regulations for the Fire Department; issuing employee personnel policies, such as the drug and alcohol policy and Non-Union Employees Light Duty Policy, which the Borough was required to do by its workers’ compensation carrier, (FOF ¶¶ 23-24; Hr’g Tr. at 151, R.R. at 162a); and controlling the Fire Department’s budget and staffing, including requiring background checks and having the volunteer firefighters clock in and out, (FOF ¶¶ 11,14, 26). Maintaining a drug and alcohol free workplace and ensuring that the Fire Department is properly staffed with individuals who pass background checks makes sense in the context of the Borough’s workers’ compensation obligations. Likewise, because the Borough is required to pay workers’ compensation for the volunteer firefighters, it is logical for the Borough to retain some control over the Fire Department’s rules and regulations in order to minimize injuries to firefighters for which it may be liable. Consequently, when these Findings of Fact, which were relied upon by the Board to conclude that the Borough exercised control over the working conditions, are analyzed within the specific statutory framework applying to voluntary firefighters, their legal significance under Act 111 is lost.
Similarly, several other of the Findings of Fact related to the Borough’s control over firefighter selection and disciplinary matters lose their legal significance when evaluated in terms of the evidence and the Borough’s statutory obligations. Regarding hiring, the Fire Chief initially selects the volunteer firefighters, and the Borough Council appoints firefighters to the Fire Department based on the Fire Chiefs recommendations; however, there is no evidence that the Borough Council ever rejected one of the Fire Chiefs recommendations. (FOF ¶ 20; Board Final Order at 7.) Although the Borough is involved in an aspect of the selection process, given the Borough’s statutory liability for volunteer firefighters’ workers’ compensation and other volunteer firefighter benefits, the volunteers’ use of the Borough’s equipment and facilities, and the Borough’s statutory role regarding the volunteer firefighters’ attendance at the *404 Training School, it is prudent for the Borough to exercise a modicum of control over the selection of volunteer firefighters. Moreover, because of the Borough’s statutory responsibility under Section 1202(56) of the Borough Code to provide firefighting services in a safe and effective manner within the Borough and to reduce any risk to the public in the provision of such firefighting services, 8 Pa. C.S. § 1202(56), the Borough has an obligation to ensure that the volunteer firefighters selected to serve are reliable, trustworthy, and properly trained to use the Borough’s equipment.
Further, with respect to the Borough’s control over disciplinary matters, I disagree with the Majority that there was substantial evidence to support the finding that the Borough has the final say over disciplinary matters.[9] Although the Borough Manager does have the authority to discipline volunteer firefighters who violate the Borough’s policies, (FOF ¶ 20), the Board’s finding that the Borough has the final say because a firefighter that is unhappy with the Fire Chiefs decision can “appeal” to the Borough Manager is based on testimony that I believe is inadequate to allow a “reasonable mind [to] accept [it] *405 as adequate to support [that] conclusion.” Delaware Cnty. Lodge No. 27, Fraternal Order of Police v. Pa. Labor Relations Bd., 694 A.2d 1142, 1145 n.5 (Pa. Cmwlth. 1997). I would not conclude that the fact that an unhappy firefighter could “contact” the Borough Manager with questions is the equivalent of the right to appeal. Moreover, the Borough Secretary’s testimony that she “did not know” or “believed” or “guessed” that a firefighter could “appeal” to the Borough Manager was equivocal[10] and, therefore, does not constitute substantial evidence to support the finding that the Borough had the final say over disciplinary matters. See Subdivision Servs. Corp. v. Zoning Hearing Bd. of Charlestown Twp., 784 A.2d 850, 852 (Pa. Cmwlth. 2001) (stating that “equivocal testimony can[not] be deemed substantial so as to justify the [factfinder’s] reliance thereon .... ”); Feinberg v. Unemployment Comp. Bd. of Review, 160 PaCmwlth. 524, 635 A.2d 682, 686 (1993) (equating “testimony which is so uncertain or inadequate” with being “equivocal” and stating that “[w]here testimony is so inadequate or contradictory!, i.e. equivocal] that ... findings of fact based upon it become mere conjecture, it fails to meet the test of substantiality”).
As argued by the Borough, because it has a statutory obligation to provide workers’ compensation for the firefighters and is statutorily authorized to own the Fire Department buildings and equipment, the Borough’s ability to enforce some of its policies in the Fire Department is not dis-positive of the existence of an employment relationship. Similarly, the Borough’s obligation to provide firefighter services to the public in a safe and effective manner means that the Borough has a responsibility to ensure that firefighters do not violate Borough personnel policies related to public safety, such as the drug and alcohol policy.
Finally, my conclusion that no employment relationship exists in this matter finds additional support in the recent case of Tyrone Fire Patrol Company No. 1 v. Tyrone Borough, 92 A.3d 79 (Pa. Cmwlth.), petition for allowance of appeal denied, 629 Pa. 641, 105 A.3d 739 (2014), cert. denied, — U.S. -, 135 S.Ct. 1749, 191 L.Ed.2d 704 (2015). In Tyrone Fire Patrol, three members of the Tyrone Fire Police Association were terminated by the Tyrone Borough Council. Tyrone Fire Patrol, 92 A.3d at 86. The three Fire Police members filed an action against the borough contending that the borough had violated their due process rights by removing them without a notice and a hearing. Id. This Court determined that they would only have a right to a hearing if they could establish that their dismissal affected “a statutory or contractual right of continued employment.” Id. at 91. We applied the Sweet test to determine whether an employment relationship existed, noting that, although “Fire Police members [were] confirmed by the Borough Council, serve[d] at the pleasure of the Borough Council, and [could] be removed at any time for any reason by the Borough Council, the Fire Companies, and not the Borough Council, [had] the authority to nominate potential Fire Police members.” Id. We further determined that fire police members could not serve if they were not in good standing with the fire companies, a determination made solely by the fibre companies and not the borough. Id. Thus, we concluded an employment relationship did not exist between the members and the borough council. Id.
*406 The facts of the instant case are remarkably similar to Tyrone Fire Patrol. Like Tyrone Fire Patrol, although the Borough Council here confirms firefighters, it is the Fire Chief, rather than the Borough, who actually selects the firefighters. Moreover, similar to Tyrone Fire Patrol where the Fire Police members had to be in good standing with their fire companies in order to serve, which was determined solely by the fire companies, it is the Fire Chief, instead of the Borough, who exercises most control over disciplinary matters in the instant matter. Thus, Tyrone Fire Patrol provides additional support that there is not an employment relationship between the Borough and firefighters.
The Majority would find that Tyrone Fire Patrol is inapposite because, it involved a different legal question and, unlike here, there was no evidence that the firefighters were paid an hourly wage. While Tyrone Fire Patrol did involve a different legal question, whether the volunteer firefighters had a contractual or continued expectation to employment so as to render a decision to remove them an ap-pealable adjudication, that matter also involved, as here, an inquiry into the employment relationship between volunteer firefighters and the borough that they served. Moreover, although Tyrone Fire Patrol states that the individuals were not paid employees, it does so based on its observation that the borough’s ordinance at issue authorized the borough to, in its discretion, pay those volunteer firefighters for their services as members of the fire police. Id. at 92 n.14. I note that, other than this reference, there is nothing in the recitation of the facts in Tyrone Fire Patrol that states these individuals were not paid for their services as the borough was authorized to do under its own ordinance. Finally, it is well-established that “[t]he duty to pay an employe’s salary is often coincident with the status of employer, but not solely determinative of that status.” Sweet, 322 A.2d at 365 (emphasis added). Further, several of the statutes involving volunteer firefighters discussed infra plainly allow volunteer firefighters to receive compensation and benefits without losing their volunteer status. Thus, it is consistent with precedent and the established statutory framework to conclude that payment of an hourly wage by the Borough to the volunteer firefighters, in and of itself, is not dispositive of an employment relationship.
For these reasons, I respectfully dissent from the Majority and would hold that the Board erred in concluding that an employment relationship exists between the Borough and the volunteer firefighters.[11]
Judges Simpson and Covey join in this dissenting opinion.

. References to "Fire Department” in this case are to the separate non-profit corporation, incorporated as "Emmaus Fire Department,” and established as a "volunteer” Fire Department, (Borough Ordinance No. 887, R.R. at 350a), and not a department of the Borough government.

. The Pennsylvania State Association of Boroughs and the Pennsylvania State Association of Township Supervisors also filed amicus curiae briefs in support of the Borough.

. November/December 2014 Newsletter, The Center for Rural Pennsylvania: A Legislative Agency of the Pennsylvania General Assembly, http://www.rural.palegislature.us/ publications_newsletter_l 114.html#story3 (last visited March 8, 2017).

.For example, the Borough Code provides that boroughs must "ensure that ñre and emergency medical services are provided within the borough by the means and to the extent determined by the borough, including the appropriate financial and administrative assistance for these services.” Section *400 1202(56) of the Borough Code, 8 Pa. C.S. § 1202(56) (emphasis added). The Borough Code explicitly allows borough councils to fund volunteer fire companies by authorizing borough councils to levy taxes "for the purposes of making appropriations to fire companies both within and without the borough and of contracting with adjacent municipalities or volunteer fire companies in adjacent municipalities for fire protection.’’ Section 1302(6) of the Borough Code, 8 Pa. C.S. § 1302(6). Similarly, Section 3 of what is commonly known as the Second Class City Code, Act of March 7, 1901, P.L. 20, gives Second Class Cities, i.e. Pittsburgh, the power "to organize a fire department, with or without pay." 53 P.S. § 23149.

. Pursuant to Section 7403 of the Emergency Management Services Code (EMS Code), "[a] city, borough or township may expend out of the public funds of the municipality an amount necessary to secure insurance or compensation for volunteer firemen killed or injured while going to, returning from or attending fires in the municipality or territory adjacent thereto.” 35 Pa. C.S. § 7403.

. Section 1202(26)(i)(A) of the Borough Code, 8 Pa. C.S. § 1202(26)(i)(A). Accordingly, Section 601 of the Workers’ Compensation Act (WC Act), Act of June 2, 1915, P.L. 736, added by Section 15 of the Act of December 5, 1974, P.L. 782, as amended, 77 P.S. § 1031, allows volunteer firefighters to obtain workers' compensation insurance from the municipality they serve.

. Under what is commonly known as the Volunteer Firefighters' Relief Association Act (VFRAA), 35 Pa. C.S. §§ 7411-7419, municipalities are encouraged to provide funds to volunteer firefighters’ relief associations so that volunteer firefighters may receive certain benefits and protections. A "Volunteer firefighters’ relief association” is defined as:
An organization formed primarily to afford financial protection to volunteer firefighters against the consequences of misfortune suffered as a result of their participation in the fire service. The organization may contain within its membership the members of one or more fire companies and may serve secondary purposes, as set forth in this sub-chapter, but only if adequate provisions have been first made to serve the primary purpose.
35 Pa. C.S. § 7412. The purpose of the VFRAA is “to encourage individuals to take part in the fire service as volunteer firefighters by establishing criteria and standards for orderly administration and conduct of affairs of firefighters' relief associations to ensure ... that funds shall be available for the protection of volunteer firefighters and their heirs.” Section 7413 of the VFRAA, 35 Pa. C.S. § 7413. Further, under Section 7416(f) of the VFRAA, volunteer firefighters may obtain other benefits such as life, health, disability, and rehabilitation insurance. 35 Pa. C.S. § 7416(f). Volunteer firefighters may also receive pension contributions from the Commonwealth pursuant to the Foreign Fire Insurance Tax Distribution Law (FFITDL), Act of December 18, 1984, P.L. 1005, 53 P.S. §§ 895.701-.707. The FFITDL allocates Commonwealth funds to municipalities in order to provide certain benefits to municipal firefighters, such as pensions. Sections 703, 706 of the FFITDL, 53 P.S. §§ 895.703, 895.706. However, in order to obtain pension contributions, the governing body of a municipality must certify to the Pennsylvania Auditor General that the relief association is actually comprised of volunteer firefighters.

. See also Section 601(a)(1) of the WC Act, 77 P.S. § 1031(a)(1) (acknowledging that, in certain instances, volunteer firefighters may receive actual payment for their services while still being considered volunteers).

. The Board found that although the Fire Chief handles disciplinary matters, "the final say on discipline rests with the Borough” because a firefighter that is unhappy with a disciplinary action "may appeal the decision to the Borough Manager.” (FOF ¶21.) Although when the Fire Chief terminated one of the volunteer firefighters he sent a letter to the terminated firefighter informing him that he could contact the Borough Manager with questions, (Borough's Ex. 37, R.R. at 557a), there is not substantial evidence in the record that the final say on discipline rests with the Borough or that disciplined firefighters could appeal to the Borough Manager. The Board’s finding was based, in part, on the following cross-examination testimony of the Borough Secretary regarding the termination letter sent by the Fire Chief:
Q. Okay. Okay. The letter that you were shown, R-37, ...
A. Yes.
Q.... the last paragraph, it says if you have any questions, please feel free to contact either the Borough manger [sic] or myself.
A. Yes.
Q: Why would the Borough manager be included in that letter?
A. Because I believe if they have a major problem they can go above the department head, the fire chief, and go to the Borough.
[[Image here]]
A. If they don't' like that, their final recourse would be going to the Borough to find out, you know, why they can't ... get a response ...
Q. And can the Borough manager overrule the fire chief?
A. I never have had that problem.
Q. Well, if he couldn’t, why would he be in this letter?
A. I guess he would be able to.
(Hr’g Tr. at 325-27, R.R. at 336a-38a.) The Borough Secretary also testified about another firefighter that was disciplined:
Q.... do you know if [the firefighter] appealed to the Borough manager his discipline?
A. No, I don’t believe he did.
[[Image here]]
Q. Did he have the right to?
A. I don’t know. I’m not sure. His next step would have been to go back to the Fire Board.
[[Image here]]
Q. And if [the firefighter] didn’t like the decision of the Fire Board, he could then go to the Borough manager?
A. I would say yes.
(Hr’g Tr. at 327, R.R. at 338a.)
When the Borough Secretary was asked whether a firefighter could appeal an adverse disciplinary decision to the Borough Manager, she stated that she believed that a firefighter who disagreed with a disciplinary determination could go to the Borough and that, although it did not ever happen, when pressed for an answer, she guessed that the Borough Manager would be able to overrule the Fire Chief. Moreover, when asked about whether another firefighter could have appealed to the Borough Manager, after saying she did not know and was not sure, after being pressed she finally stated, "I would say yes.” (Hr'g Tr. at 327, R.R. at 338a (emphasis added).)

. Equivocal testimony is that which is vague and leaves doubt as to its meaning. Chadwick v. Workmen's Comp. Appeal Bd. (Benjamin Franklin Hotel), 132 Pa.Cmwlth. 525, 573 A.2d 652, 655-56 (1990).

. In response to footnote 9 of the Majority opinion, the Dissent is not suggesting that Act 111 is incompatible or in conflict with the statutory scheme regarding volunteer firefighters and, therefore, is repealed as to volunteer firefighters. Rather, given the numerous statutes enacted to allow municipalities to provide aid and assistance, such as financial assistance, pension and workers’ compensation benefits, equipment, and training, to the volunteer firefighters that serve that community, volunteer firefighters occupy a unique area in the context of traditional employment relationships. Thus, when determining whether an employment relationship under Act 111 exists in volunteer firefighter cases, by using, for example, the test set forth in Sweet, the Dissent simply would require the facts to be analyzed in light of this vast statutory framework to determine whether they signify a true employment relationship for the purposes of Act 111. Facts that might suggest an employ *407 ment relationship in other employment situations may not necessarily (and here do not) signify the intent to create such relationship between the volunteer firefighters and the municipality they serve, but could be the result of the municipality providing the assistance and aid permitted by these various laws. In other words, there has to be a determination whether the municipality’s actions intended to create an employment relationship or were simply intended to provide aid and assistance as approved by the statutory framework. Moreover, the Majority reiterates its position that the Borough exercises control over, inter alia, the discipline and discharge of the volunteer firefighters resulting in the merger of the municipality and the volunteer fire department for the purposes of Act 111 and employment law. However, as discussed, the Dissent would conclude that these findings are not supported by substantial evidence, but are based on testimony that is equivocal.